IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2016


**MARCUS ANTHONY PEARSON v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-1912    Monte Watkins, Judge**

———————————————————

**No. M2015-01159-CCA-R3-PC – Filed May 13, 2016**

———————————————————


Marcus Anthony Pearson ("the Petitioner") filed a petition for post-conviction relief alleging several claims of ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. On appeal, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR. J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

David Hopkins, Murfreesboro, Tennessee, for the appellant, Marcus Anthony Pearson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

**I. Factual and Procedural Background**

*Trial*

On September 28, 2006, the Davidson County Grand Jury indicted the Petitioner and his brother, Elvin Hubie Pearson,[1] with the following charges:

---

[1] Because the Petitioner and his brother share a common last name, we will refer to Elvin by his first name in this opinion to avoid any confusion. We intend no disrespect.

| Count | Offense | Victim |
|---|---|---|
| 1 | First Degree Premeditated Murder | Kenneth Easley Scott |
| 2 | Attempted First Degree Premeditated Murder | Lamarco Cornell Comer |
| 3 | Aggravated Assault | Frank Newsome III |
| 4 | Unlawful Possession of a Firearm | n/a |

On July 20, 2007, the Davidson County Grand Jury issued a superseding indictment, charging the Petitioner and Elvin with the following offenses:

| Count | Offense | Victim |
|---|---|---|
| 1 | First Degree Premeditated Murder | Kenneth Easley Scott |
| 2 | First Degree Felony Murder (committed during the murder or attempted murder of Frank Newsome) | Kenneth Easley Scott |
| 3 | First Degree Felony Murder (committed during the murder or attempted murder of Lamarco Cornell Comer) | Kenneth Easley Scott |
| 4 | Attempted First Degree Premeditated Murder | Frank Newsome |
| 5 | Attempted First Degree Premeditated Murder | Lamarco Cornell Comer |
| 6 | Unlawful Possession of a Firearm | n/a |

Both indictments listed the offense date for each count as April 15, 2006.

The Petitioner and Elvin were tried together, and the following evidence was presented at trial:

> . . . [A]t about 11:00 a.m. on April 15, 2006, one of the victims, Kenneth Scott, left the house in which he lived with his parents. At about 2:00 p.m., Scott's father called Scott's cell phone to inquire whether Scott needed to be picked up and taken to work. Scott replied that he did not because he

was riding with Frank Newsom[e], another one of the victims. At some point, Newsom[e] and Scott picked up the third victim, Lamarco Comer, who needed help transporting his mother's broken-down car to the repair shop. After taking the car to the shop, Newsom[e], Scott, and Comer drove to Knoll Crest Apartments ("Knoll Crest").

Newsom[e] had spoken earlier in the day to Andrew Shute, who had told Newsom[e] that he had agreed to sell $600 to $700 of marijuana to one of the Defendants, [the Petitioner]. Shute had also told Newsom[e] that he planned to "slick" [the Petitioner] out of the money, meaning that he planned to take the money from [the Petitioner] and leave without delivering any marijuana. Scott and Comer had no knowledge of this plan. Shute saw Newsom[e]'s car as it pulled into Knoll Crest; he called Newsom[e]'s cell phone and told Newsom[e] to meet him at the top of the apartment complex. Newsom[e] did so. Shute got into Newsom[e]'s car with Newsom[e], Scott, and Comer. Shute then called [the Petitioner], told him he was coming to Knoll Crest, and instructed [the Petitioner] to park at a particular place for their meeting. Shute instructed Newsom[e] to drive him to that place.

Upon their arrival, Shute saw [the Petitioner's] gold Dodge Stratus in a parking space at the appointed location. Newsom[e] parked in an adjacent space. Shute exited Newsom[e]'s vehicle and got into the backseat of [the Petitioner's] vehicle. [The Petitioner] was in the driver's seat and his younger brother, Ronald Ettienne, was in the front passenger seat. [The Petitioner] was parked in front of a building with a breezeway running through its center; Shute told [the Petitioner] that he had the marijuana in the breezeway and that he would return with it if [the Petitioner] gave him the money. [The Petitioner] did so. Shute exited [the Petitioner's] car, walked into the breezeway and, after turning around to make sure he was out of sight, ran to a waiting friend's car. They left.

Newsom[e], Scott, and Comer, drove away immediately after Shute entered [the Petitioner's] vehicle. They went to a nearby convenience store, returning to Knoll Crest between fifteen and sixty minutes later, intending to visit Newsom[e]'s sister's apartment in Knoll Crest's building F. As they parked in front of building F and exited the vehicle, [the Petitioner's] car and another unidentified car pulled up to the right. Elvin Pearson exited the unidentified car and walked toward [the Petitioner's] driver's side door, at which point [the Petitioner] exited the car.

- 3 -

Newsom[e], Scott, and Comer now faced the parking lot, with their backs to the entrance of a two-sided breezeway running away from them and through building F. Comer stood between Newsom[e] and Scott; Scott stood on Comer's left and Newsom[e] stood on Comer's right. Elvin and [the Petitioner] walked toward them. Elvin stood in front of Newsom[e], and [the Petitioner] stood in front of Scott. Elvin asked Newsom[e], "where your boy at?" Newsom[e], assuming he was referring to Shute, responded that he did not know. Elvin and [the Petitioner] each pulled out a gun; [the Petitioner's] gun was black and Elvin's gun was silver and black. Elvin pointed his gun at Newsom[e]'s face and chest. He then grabbed Newsom[e] by the shirt and demanded [the Petitioner's] money. Newsom[e] responded that he could call Shute and produced Scott's cell phone, which he had been holding. Newsom[e] dialed Shute's number and handed the phone to Elvin.

Elvin put the phone to his ear for a few moments and then angrily hung up. It is not clear whether he spoke to anyone or heard a voicemail message. After hanging up, he grabbed Newsom[e] again. At that moment, a car drove by through the parking lot and a woman yelled, "Hey, there's Booty Man" from inside. "Booty Man" is Newsom[e]'s nickname. Hearing this, Elvin and [the Petitioner] turned toward the parking lot. Seeing an opportunity for escape, Newsom[e] pulled away from Elvin, turned around, and ran through the left side of the breezeway. Newsom[e] heard shots after he had taken about two steps and saw Comer running through the right side of the breezeway. As Newsom[e] rounded the corner at the end of the breezeway he saw Elvin shooting at him. He then continued to run into the grass field behind building F. Newsom[e] was not hit and did not see any bullets hit Comer or Scott.

As Comer began running through the breezeway, he saw Scott try to run around the building. Comer also saw Elvin shooting at him. A bullet hit Comer in the leg; as he tried to get up Elvin shot him two more times in the same leg. At about the time Elvin fired the third shot into Comer's leg, Comer saw [the Petitioner] shoot Scott in the back. Comer heard about fifteen total shots. Police later found eight .40 caliber cartridge casings, five of which were clustered at the right entrance to the breezeway near where [the Petitioner] had been. The other three fell near the left entrance. Police also found five 9mm cartridge casings at the left entrance, near where Elvin had been. Comer was shot with 9mm bullets, and Scott with .40 caliber bullets.

- 4 -

Newsom[e] turned around when the shots stopped and saw Comer crawling out of the breezeway. He also saw Scott running through the field holding his stomach. Scott then fell down. He then saw a policeman run onto the field and check both Comer and Scott before going to the front of the building. Newsom[e] then ran over to Comer, who was still talking. He told Comer to hold on. He then ran over to Scott, who was lying face down in the grass. Newsom[e] intended to roll Scott over, but he was told not to by a member of the crowd that had gathered. Newsom[e] stayed in the field with Scott and Comer until paramedics arrived.

Karen Carney, another Knoll Crest resident, lived in building G, the building immediately next to building F. Just before the shooting, she went out onto her back porch with her son. She then saw a neighbor named Carlos with whom she had experienced problems in the past. As a result, she went back inside. She then heard shots coming from outside. After putting her son under the kitchen table, she looked out her front window and saw three black males, each carrying a gun, get into separate cars and drive away. Two wore baseball caps and all three had braided hair. She looked out her back window and saw Comer and Scott lying in the field.

Officer Edward Draves of the Metro Nashville Police Department responded first to the incident. He had been at building R on another call when he heard ten to fifteen shots coming from the vicinity of building F, about fifty to seventy yards away. Later testimony established that the shooting occurred at about 4:50 p.m. As he reached the field behind building F, Officer Draves saw two black males, later identified as Comer and Scott. Comer was running toward Officer Draves, while Scott ran away from him. Officer Draves drew his weapon on Comer and told him to [lie] on the ground. Comer told Officer Draves that he had been shot. After patting down Comer and calling for backup, Officer Draves ran over to Scott, who had fallen down. Officer Draves ordered Scott to put his hands out, but he received no response. Officer Draves saw a bullet entry wound underneath Scott's left shoulder. After confirming that Scott had no weapons, Officer Draves rolled him over and observed a bullet exit wound above Scott's heart.

Officer Draves went to the front of building F. He found some casings on the ground and bullet strikes on the walls. He then returned to Scott and Comer. Other officers arrived about one minute later, and the first ambulance arrived three or four minutes later. A large crowd had

gathered, and the ten or so total officers that had arrived worked to put tape around the crime scene.

Upon their arrival, paramedics cut Scott's clothes off and transported him by ambulance to Skyline Hospital. Other paramedics cut Comer's clothes off and transported him by ambulance to Vanderbilt Hospital. Newsom[e], still in the area, did not talk to police. Detective James Bledsoe of the Metro Nashville Police Department arrived on the scene at about 5:20 p.m. and began speaking to witnesses and supervising the area. After viewing Comer and Scott's bloody clothes in the field behind building F and learning which hospitals they had been transported to, [Detective] Bledsoe instructed another detective, Harold Burke, to go to Skyline Hospital and check on Scott. Detective Burke later called [Detective] Bledsoe to inform him that Scott had never regained consciousness and had died at the hospital. Detective Burke also informed [Detective] Bledsoe that he had spoken to Scott's father at Skyline, who gave him a note that said "The Shooter" and listed [the Petitioner's] phone number. Scott's father had apparently received that note from Newsom[e]'s stepfather. Burke also spoke to Newsom[e] and learned of [the Petitioner's] potential involvement in the shooting. Newsom[e]'s mother then insisted that he stop talking to the police.

The next day, April 16, 2006, [Detective] Bledsoe and [Detective] Burke visited Comer at Vanderbilt Hospital. Although he was drugged with pain medication, Comer's nurses and both detectives concluded Comer was lucid enough to speak to them. Comer testified at trial that he was "hallucinating" at the time and that he had no memory of [Detective] Bledsoe visiting him on April 16. Based on Newsom[e]'s information, [Detective] Bledsoe asked Comer to look at a series of six photographs. Upon reaching [the Petitioner's] photograph, the third in the series, [Detective] Burke saw Comer nodding his head. Comer said, "I think that's him." Detective Bledsoe then showed Comer the remaining photographs, followed by the first, second, and third photographs again. Upon reaching the third photograph for the second time, Comer said, "that's the one with the black gun." Comer also described the shooting to [Detective] Bledsoe and said that the second shooter was either [the Petitioner's] brother or cousin.

Detective Bledsoe spoke to Comer again on April 20, 2006. On that day, he brought another series of six photographs, one of which depicted Elvin. When Comer reached Elvin's picture he said, "That might be him

- 6 -

but his hair is different." Comer went through the rest of the series and started over, as he had with the first lineup. When he reached Elvin's picture the second time, he reiterated his non-positive identification, saying that the person depicted could have been the second shooter but that his hair was too different in the picture to say for sure; the shooter had braids, whereas the pictures showed men with short hair. Comer did, however, positively identify both Elvin and [the Petitioner] as the shooters at trial. Comer had never met Elvin or [the Petitioner] before the shooting.

Later that day, [Detective] Bledsoe talked to Carney, whose name he had received from Officer Draves. She gave her account of what had happened but was unable to identify any of the perpetrators using [Detective] Bledsoe's lineups. Carney, who was "terrified" during her testimony at trial, explained that she recognized Elvin as one of the men she saw running from the crime scene. Detective Bledsoe explained that he took into account Carney's claim that a third man, her neighbor Carlos, was involved in the shooting, but he disregarded him as a suspect after speaking to Newsom[e] and Comer.

Detective Bledsoe did not speak to Newsom[e] until April 26, 2006. Newsom[e] explained that his mother had made him talk to a lawyer before speaking with the police. His lawyer recommended that he go to the police department and tell his story. During his conversation with [Detective] Bledsoe, Newsom[e] positively identified both Elvin and [the Petitioner] using the same photographic lineups Comer had examined. Newsom[e] had not spoken to Comer. Newsom[e] also identified both Elvin and [the Petitioner] as the shooters at trial. He knew [the Petitioner] before the shooting because they had both worked at UPS for a short time; he had not known Elvin.

The State introduced records from Cingular Wireless showing calling activity from [the Petitioner's] cell phone. [The Petitioner's] cell called Shute's cell a number of times between 2:43 p.m. and 4:44 p.m. on April 15, 2006. The State also introduced records from Bellsouth showing calls made from the land line in Elvin's residence on that day. Elvin did not own a cell phone. Calls were made from Elvin's land line to [the Petitioner's] cell at 4:23 and 4:24 p.m. Another call was made from Elvin's land line to another number at 5:34 p.m. A call was made to [the Petitioner's] cell again at 8:07 p.m. No other calls were made on the line during that time.

Scott's autopsy revealed that he had been shot twice. One bullet entered his back and damaged his left lung and his heart; the other entered his abdomen and damaged his small bowel. These wounds caused his death and were not survivable, but they were also not necessarily immediately disabling. Marijuana was found in Scott's system, but the quantity or exact time of use could not be determined.

The police did not recover any gun connected to the shooting. The State also did not present any physical evidence directly linking either Elvin or [the Petitioner] to the shooting.

Elvin and [the Petitioner] both chose to put on proof. Elvin's first witness, John Graves, worked at B & R Auto Sales ("B & R") on April 15, 2006. He received and processed car payments as part of his duties. He testified that Elvin came to B & R around 5:00 p.m. on the day of the shooting to make a car payment. He remembered the time because he usually counted the day's payments around then in order to deliver them to the bank by 6:00 p.m. Graves introduced a receipt given to Elvin with Graves' signature on it; it did not contain Elvin's signature. The receipt was marked "4/15/06" and included Elvin's name, but it did not have a time stamp. Graves was not one hundred percent sure Elvin was the one who made the payment, but he believed it was him; he had no association with Elvin besides periodically receiving his car payments. He had never met [the Petitioner]. Graves did not see if Elvin had anyone with him. On cross-examination, Graves agreed with the State that, at a previous hearing, he had testified that Elvin came in "after 5:00" and before 6:00 p.m.

Elvin chose to testify and gave his account of the events of April 15, 2006. He woke up around 10:00 a.m. and did some household chores. He took a nap from 1:00 to 4:20 p.m. He then called [the Petitioner], who said the family was planning to attend a church play that evening. Elvin could hear in [the Petitioner's] voice that something was wrong; [the Petitioner] then told Elvin he had given money to someone for marijuana and that he thought the person had stolen the money. [The Petitioner] had been waiting for an hour for the person to come back. Elvin told [the Petitioner] he was stupid and that he should leave.

After hanging up, Elvin told his girlfriend, Dianne Reid, to dress their baby and get ready to leave for B & R, which Elvin wanted to reach before its closing time at 5:00 p.m. Elvin, Reid, and their child left the house before 5:00 p.m.; Elvin believed they reached B & R about that time. Elvin and Reid next planned to stop at the beauty supply store. On their

way there, Elvin stopped at a gas station to get gas and cigarettes; when there, he realized he did not have his driver's license. Reid also told Elvin she needed a refill for their child's bottle.

They therefore returned to their residence. Elvin went to the bathroom, made a call to a friend, and retrieved his driver's license and a bottle refill. He and Reid then drove to the beauty supply store, where they remained for forty-five to sixty minutes while Reid tried on wigs. They left the store at about 6:41 p.m.; Elvin could say so with specificity because they had been given a receipt that said 5:41 p.m., and Reid had commented that the time was an hour early. Elvin had lost the receipt, however, and therefore could not introduce it. Elvin and Reid next went to Wal-Mart for about forty-five minutes. They then got cigarettes and gas and returned home. They arrived "after 8:00." Elvin then called [the Petitioner] and asked him about the church play.

Elvin heard two days later that [the Petitioner] had a warrant out for his arrest. Elvin realized it was a murder warrant when he saw the story on the news. He was shocked. Elvin was arrested on April 28, 2006. He had never met Scott, Comer, or Newsom[e], and had nothing to do with the shooting.

[The Petitioner] chose not to testify but called two witnesses. The first, [Detective] Willie Middleton of the Metro Nashville Police Department, testified that he helped investigate the shooting. During the course of his duties, he spoke to Comer and Comer's mother. At about 5:30 p.m. on April 15, 2006, Comer's mother had given him the name of Carlos Hart as her son's possible assailant, the same Carlos with whom Carney had experienced problems in the past and who [Detective] Bledsoe chose not to pursue as a suspect.

[The Petitioner's] and Elvin's mother, Cornelia Logan, also testified about her recollection of the events of April 15, 2006. [The Petitioner] had been at home when she woke up. She went to church at about 10:00 a.m. with her youngest son, Ronald Ettienne, and her eight-year-old daughter, Leah. She returned at about 1:30 p.m. to find [the Petitioner] still in the house. Because she planned to attend a church play later that evening, she took a nap from 3:00 to 5:00 p.m. When she woke up, she yelled for everyone to get ready for the play but received no response. [The Petitioner's] cell record reflected that he called Logan's cell at 5:15 p.m.; he told Logan that he and Ettienne had gone outside. They then walked into the house through the front door.

State v. Elvin Hubie Pearson, No. M2007-02826-CCA-R3-CD, 2009 WL 1616678, at *1-6 (Tenn. Crim. App. June 10, 2009), perm. app. denied (Tenn. Oct. 19, 2009). The Petitioner was convicted in Counts 1-5. The State entered a nolle prosequi in Count 6. The trial court merged Counts 1, 2, and 3 and imposed partial consecutive sentences for an effective sentence of life plus twenty years' incarceration.[2] This court affirmed the Petitioner's convictions on appeal but remanded the case for "resentencing solely on the issue of consecutive sentences consistent with [State v. Wilkerson, 905 S.W.2d 993, 939 (Tenn. 1995)]." Id. at *14.

*First Post-Conviction Appeal*

On June 30, 2011, the Petitioner filed a pro se petition for post-conviction relief. Marcus Pearson v. State, No. M2012-01529-CCA-R3-PC, 2013 WL 1912586, at *1 (Tenn. Crim. App. May 8, 2013), no perm. app. filed. The State filed a motion to dismiss, claiming that the petition was time-barred because "more than a year ha[d] passed since the date of the final court action of the [P]etitioner's case, his application for permission to appeal to the Tennessee Supreme Court having been denied June 10, 2009, and the instant petition having been filed June 30, 2011." Id. The post-conviction court found that the petition was time-barred and granted the State's motion to dismiss. Id. The Petitioner then appealed to this court. Id.

This court noted that the post-conviction court calculated the statute of limitations for the Petitioner's claim from June 10, 2009, and stated:

. . . However, the Petitioner's direct appeal reveals that the case was in fact remanded for resentencing on June 10, 2009, and that the supreme court denied permission to appeal on October 19, 2009; the latter date would have been date of the final action of the highest court had the case not been remanded for resentencing on the issue of consecutive sentencing. See Tenn. Code Ann. § 40-30-102(a). Given that resentencing was ordered, the judgment in the Petitioner's case would not have been final until the re-sentencing hearing was conducted and the new sentence imposed and some time after that if the Petitioner had appealed that sentence. See Tenn. R. Crim. P. 32(e) (stating that the judgment of conviction includes the sentence imposed). Thus, the trial court improperly dismissed the petition for post-conviction relief on the basis of the June 10, 2009 date. There are no judgments of conviction or any other information reflecting the date of resentencing in the record for our review to enable us to determine whether the petition was timely. However, it is clear that the period of time within

---

[2] Elvin was also convicted and sentenced for the attempted first degree murders of Comer and Newsome and one count of felony murder. Elvin Hubie Pearson, 2009 WL 1616678, at *7.

which to file a petition for post-conviction relief did not begin on June 10, 2009, and an evidentiary hearing is required to resolve the issue. As such, we remand this case for the appointment of substitute counsel for the Petitioner and an evidentiary hearing to determine the timeliness of the petition for post-conviction relief.

Id. at *2 (footnotes omitted).

The amended judgments, included in the record for the instant appeal, are dated August 22, 2013. They indicate that the trial court conducted a re-sentencing hearing on December 3, 2009, and that the trial court imposed the same partial consecutive sentences and effective sentence of life plus twenty years' incarceration. The State does not challenge the timeliness of the post-conviction petition in the instant appeal.

*Instant Post-Conviction Proceedings*

The Petitioner, through post-conviction counsel, filed several amended petitions, alleging multiple claims of ineffective assistance of counsel, the following of which are raised on appeal: (1) trial counsel's failure to file a Motion for Bill of Particulars after the superseding indictment was issued; (2) trial counsel's failure to conduct an adequate pretrial investigation of the case; (3) trial counsel's failure to adequately discuss the case with the Petitioner; (4) trial counsel's failure to convey any plea offers to the Petitioner; (5) trial counsel's failure to object to Mr. Shute's testimony about the drug deal between himself and the Petitioner; and (6) trial counsel's failure to challenge the State's theory of premeditation as a defense.

At the post-conviction hearing, the Petitioner testified that, prior to his arrest in this case, he had never been arrested before and had no prior experience with the criminal justice system. The Petitioner stated that trial counsel should have requested a bill of particulars after the superseding indictment was issued. The Petitioner asserted that there was no evidence of motive or specific intent to harm Frank Newsome and Lamarco Comer, and the Petitioner opined that "[t]he bill of particulars would have specified exactly how the felony murder, transfer [sic] intent, and the criminal responsibility theory developed." Later in his testimony, the Petitioner further explained why he thought a bill of particulars was important:

Q: . . . Why could [a bill of particulars] have made a difference in your case?

A: Because it should have showed how transfer [sic] intent theory and the felony murder theory didn't apply to this case.

Q: How so?

A: Because there was no evidence of motive. Now, going back to the Andrew Shute testimony of this drug deal going bad, the individuals wasn't [sic] part of the drug deal, so there was no motive established, as First Degree. Now, going—based on the trial transcripts, there was no evidence of me attempting to shoot Lamarco Comer and Frank Newsom[e], and the bullet going to Kenneth Scott. There was no evidence of that, so felony murder or transfer [sic] intent doesn't even apply to this case. Now, it is unfortunate, I must say, it was death. I understand that now. But there was [sic] no matters toward this individual Kenneth Scott. Had [trial counsel] requested a bill of particulars and addressed these issues, then, the First Degree wouldn't have even been on the table.

The Petitioner also claimed that he had never seen the superseding indictment until it was shown to him during the post-conviction hearing. The Petitioner admitted that trial counsel provided him with a copy of discovery before the superseding indictment was issued. However, the Petitioner was not provided any additional discovery after the superseding indictment was issued. The Petitioner stated that he did not see any evidence of premeditation in the discovery that he was provided.

The Petitioner claimed that he never had any discussions with trial counsel about filing any pretrial motions. The Petitioner stated that he met with trial counsel twice—once for about twenty-five minutes before the Petitioner turned himself in to police and once for about thirty minutes the day before trial started. The Petitioner estimated that he had "[a]bout five" court dates in the year and a half between his arrest and his trial, but he claimed that he never discussed his case with trial counsel during that time. The Petitioner knew that a notice of alibi had been filed in his case, but he claimed that he did not have any discussions with trial counsel about an alibi defense before the notice was filed. However, the Petitioner noted that the alibi defense was not presented at trial. The Petitioner did not know why the alibi defense was not presented, but he recalled that trial counsel "abandoned it after the telephone recordings were presented."

The Petitioner recalled trial counsel's telling him that the State was going to call Mr. Shute to testify. The Petitioner said he did not discuss with trial counsel what the substance of Mr. Shute's testimony might be. The Petitioner recalled that trial counsel "seemed surprised" that Mr. Shute was being called to testify because his name was not listed on the indictment. The Petitioner stated that trial counsel should have objected to Mr. Shute's testimony because it "mis[led] the jury." The Petitioner claimed that Mr. Shute's testimony was presented "to make that seem like the bad drug deal was the motive for me going after these three individuals, when that encounter didn't have anything to do with—the encounter was to locate the individual who did take the money.

- 12 -

It wasn't to commit a murder." The Petitioner acknowledged that the encounter with the victims "got out of hand and an unfortunate death occurred," but he maintained that he did not intend to kill anyone.

Additionally, the Petitioner could not recall any discussions about a defense strategy. The Petitioner said he never reviewed the discovery or discussed the strengths and weaknesses of his case with trial counsel. The Petitioner claimed that trial counsel took "[n]o steps" to interview witnesses in preparation for trial and that trial counsel did not hire a pretrial investigator. The Petitioner stated that trial counsel should have obtained Walmart security footage and should have investigated telephone calls that were introduced "about [Elvin's] testimony." The Petitioner explained that the security video and the phone calls would show that Elvin was not involved in the offenses, and he opined that, had trial counsel investigated that evidence, the Petitioner's alibi defense would have been withdrawn. However, the Petitioner did not explain how such evidence would have affected his own defense.

The Petitioner also claimed that trial counsel "should have pursued all potential defenses[,]" including challenging the State's theory of premeditation. He also stated that trial counsel failed to challenge premeditation in his argument to the jury. The Petitioner claimed that the evidence presented at trial showed that the offense was not premeditated, but the Petitioner did not explain how the evidence did not support premeditation.

The Petitioner recalled that, in the middle of trial, trial counsel mentioned that he had asked the prosecutor about a plea bargain but that a plea "wasn't on the table." The Petitioner said he did not hear about any plea offers until 2011 when Elvin showed the Petitioner a letter from his lawyer. The Petitioner said he would have considered accepting a plea offer if it had been communicated to him.

On cross-examination, the Petitioner acknowledged that, initially, he and Elvin had planned to proceed to trial with an alibi defense. However, prior to trial, jail phone calls were discovered that compromised Elvin's alibi defense. The Petitioner also admitted that trial counsel did not have a duty to pursue an insanity defense for the Petitioner because it was not supported by the facts. However, the Petitioner maintained that trial counsel should have challenged the State's theory of premeditation as a defense. The Petitioner also acknowledged that such a defense would necessarily admit that the Petitioner was present at and involved in the shooting. The Petitioner knew such a defense was inconsistent with the alibi defense, but he insisted that, had trial counsel conducted an adequate pretrial investigation and conferred with the Petitioner, "things would have been different, a whole lot different." The Petitioner also averred that he had "no in depth conversations outside of this courtroom" about his case with trial counsel and that trial counsel only came to the jail once to discuss the case with the Petitioner. The Petitioner's jail visitation records, introduced as an exhibit at trial, showed that an

attorney with trial counsel's name visited the Petitioner about a month prior to trial and two other attorneys visited the Petitioner about a week before that, but the Petitioner said he did not recall any of those meetings. However, the records also showed that trial counsel visited the Petitioner in the jail the day prior to trial, and the Petitioner did recall that meeting.

Elvin Pearson testified that he is the Petitioner's older brother and co-defendant. Elvin noted that he and the Petitioner were often brought to court, but he said he could not recall seeing the Petitioner speak with anyone when they came to court. Prior to trial, Elvin did not have any discussions with the Petitioner about plea bargains. However, after they were convicted, Elvin was going through some of his paperwork from the case and found a letter from his attorney. Elvin told the Petitioner what the letter said, and he said the Petitioner seemed surprised by its contents. Elvin said the Petitioner had no prior experience with the criminal justice system before being arrested in this case.

Trial counsel testified that, when he first met with the Petitioner, there was an outstanding warrant for the Petitioner's arrest, and trial counsel advised the Petitioner to turn himself in. Before the preliminary hearing, trial counsel went to the crime scene and took photographs. Trial counsel admitted that he did not hire a pretrial investigator, but he stated that Elvin's counsel had hired an investigator and that trial counsel was given access to the investigator's file. Trial counsel said he worked very closely with Elvin's attorney because both Elvin and the Petitioner were pursuing an alibi defense. Trial counsel noted that both the Petitioner and Elvin "espoused from day one" that they were not involved in this crime. Trial counsel stated that, based on his experience, it would not have been feasible to pursue both an alibi defense and argue to the jury that the killing was not premeditated because the defenses were inconsistent.

Trial counsel said he doubted that he would have met with a defendant charged with first degree murder only two times, but he noted that he did not keep a log of how many times he met with the Petitioner. Trial counsel did meet with the Petitioner's mother and younger brother "a couple of times" because they were the Petitioner's alibi witnesses. According to trial counsel, the Petitioner's alibi was that he got off work, went home, changed into "house clothes," and was at home when the crimes occurred. The Petitioner's mother and younger brother supported this defense. Trial counsel stated that, because the Petitioner's defense was that he was not present at the scene of the crimes, most of trial counsel's preparation was with the Petitioner's mother and younger brother. Trial counsel noted that the victims contradicted the Petitioner's alibi but that "there was [sic] issues about whether they had a motive to make this up completely." Based on the information provided, trial counsel concluded that the alibi was the best defense possible. However, trial counsel recalled that, on the morning of trial, some

jailhouse phone calls emerged which indicated that the alibi was fabricated.  Trial counsel could not recall whether the Petitioner or Elvin was on the recorded phone calls.

Trial counsel said he was able to discuss the facts of the case with the Petitioner and that he provided the Petitioner with a copy of the discovery received in his case.  Trial counsel thought that Elvin was "running the show," and he opined that the Petitioner was manipulated by Elvin so that both of them were asserting an alibi defense.  Trial counsel noted that the Walmart security videos and phone calls that the Petitioner mentioned in his testimony were not relevant to the Petitioner's case; instead, they showed Elvin's whereabouts on the day of the offense.

Trial counsel could not recall when he learned that Mr. Shute was going to testify, but he said he "did have some knowledge about him."  Trial counsel said that he would have objected to Mr. Shute's testimony if he did not have prior knowledge about him because his name was not listed on the indictment.  Trial counsel did not recall interviewing Mr. Shute prior to trial.

Trial counsel explained that there was never a formal plea offer in the Petitioner's case.  Trial counsel recalled discussions with the State about a "package deal" wherein any offer to the Petitioner was contingent upon Elvin's also pleading guilty.  Elvin's attorney was adamant that his client would not plead guilty, and no separate offer was extended to the Petitioner.  Trial counsel believed that he told the Petitioner about the package deal while the Petitioner was in the holding cell outside of the courtroom.

On cross-examination, trial counsel stated that the State's theory of the case did not change when the superseding indictment was issued.  Trial counsel said he did not obtain any additional discovery after the superseding indictment was filed and that he did not file an additional request for discovery because, after discussing the matter with the State, trial counsel learned that "it was the same discovery."  Further, trial counsel said he did not request a continuance after the superseding indictment was filed because it was within ten days of trial and "[i]t was the same evidence."  Moreover, the superseding indictment did not change the Petitioner's alibi defense.

Trial counsel explained that he did not file a bill of particulars after the superseding indictment was issued because the Petitioner had already filed a notice of alibi.  Additionally, trial counsel understood that a bill of particulars was used to learn the date, time, and place of a crime.  Trial counsel stated the he did not advise the Petitioner of other potential defenses because the Petitioner "was so adamant about the alibi defense."  Trial counsel stated that he could not recall interviewing the victims or the eyewitness to the offense.  However, trial counsel stated, "Once the alibi defense was developed that is where we stood . . . .  Our whole defense was the alibi defense."

In a written order, the post-conviction court denied relief, stating the following:

The Court finds that counsel provided discovery to the [P]etitioner to review and that there was no additional discovery in the super[s]eding indictment. There was no need to request a continuance. The Court further finds that Petitioner has offered no proof that had trial counsel received a more particular description it would have changed trial strategy or affected the outcome of the trial. . . . Petitioner's alibi defense was abandoned due to lack of evidence to support the defense. The Court further finds that Petitioner has offered no proof that if counsel had [proceeded] with the alibi defense that the outcome would have been different. Additionally, [P]etitioner claims that counsel was deficient because he failed to object to the testimony of Andrew Shute. However, [P]etitioner did not present any evidence that would support that there would be a different outcome had there been an objection.

Petitioner has failed to demonstrate by clear and convincing evidence ineffective assistance of counsel in violation of a constitutional right to render his conviction and sentence void or voidable under the Post Conviction Relief Act. The Court does not find the [P]etitioner's testimony to be credible. Accordingly, the Court finds that Petitioner has failed to show that he was prejudiced by counsel's allegedly deficient conduct. . . . The Court further finds that Petitioner has offered no proof that if counsel would have objected to the testimony of Shute the outcome would have been different.

(citations omitted). This timely appeal followed.

## II. Analysis

On appeal, the Petitioner argues that trial counsel was ineffective for failing to (1) conduct an adequate pretrial investigation; (2) meet with the Petitioner to discuss the case; (3) file an additional discovery request or a Motion for Bill of Particulars after the superseding indictment was issued; (4) convey plea offers to the Petitioner; (5) object to Mr. Shute's testimony about the drug deal between himself and the Petitioner; and (6) challenge the State's theory of premeditation as a defense to first degree murder.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against

such findings.  Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015).  When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court.  Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)).  Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]."  Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457.  The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness.  Kendrick, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee.  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors:  (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases).  Both factors must be proven in order for the court to grant post-conviction relief.  Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor.  Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)).  Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579.  We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision.  Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases."  Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369.  In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

**Pretrial Investigations:**

The Petitioner asserts that trial counsel was ineffective because "he did practically no pre-trial investigation, failed to interview any of the State's witnesses prior to trial, and did not obtain the services of an investigator to assist him." Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." Baxter, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; see also State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691.

We note that trial counsel went to the crime scene to take photos and that he examined the file created by Elvin's pretrial investigator. Moreover, trial counsel testified that the Petitioner was adamant that he was not present at the scene of the crimes. Trial counsel interviewed the Petitioner's mother and younger brother to confirm the Petitioner's alibi. It was not until the morning of trial that trial counsel discovered that the Petitioner's alibi was fabricated. By insisting that he had an alibi, the Petitioner gave trial counsel "reason to believe that pursuing certain investigations would be fruitless or even harmful[.]" See id. Therefore, trial counsel's failure to conduct other investigations cannot now be challenged as unreasonable. The Petitioner is not entitled to relief on this allegation.

**Failing to Meet with the Petitioner to Discuss Case:**

The Petitioner also claims, "Prior to trial, trial counsel did not meet with [the Petitioner] to adequately discuss the case, possible defenses, and settlement offers. Instead, trial counsel decided that [the Petitioner's] defense would be alibi[] and did not consider any other defenses." However, trial counsel testified that he believed that he met with the Petitioner more than two times, and he confirmed the Petitioner's alibi with

- 18 -

his mother and younger brother. Further, because the Petitioner insisted that he was not present at the crime scene and the Petitioner's family confirmed his alibi, trial counsel conducted most of the trial preparation with the Petitioner's mother and younger brother. As noted above, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691. Here, trial counsel met with the Petitioner a sufficient number of times to learn that the Petitioner had an alibi; the Petitioner's mother and younger brother confirmed that alibi, and trial counsel pursued that defense. Further, the post-conviction court found that trial counsel had provided discovery to the Petitioner, and it discredited the Petitioner's testimony that trial counsel never informed him of the package plea agreement. The Petitioner has failed to show that counsel was deficient for failing to meet with the Petitioner and discuss the case.

**Pretrial Discovery and Bill of Particulars:**

The Petitioner argues that trial counsel should have asked for additional discovery and requested a bill of particulars after the superseding indictment was issued in order to determine what evidence the State intended to use to prove premeditation. Further, the Petitioner asserts that a bill of particulars "would have also eliminated the theory of criminal responsibility for the actions of [Elvin] as it would have been demonstrated that [Elvin] also acted without premeditation."

"On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charge." Tenn. R. Crim. P. 7. The purpose of a bill of particulars is threefold: (1) to provide the "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense"; (2) to assure that the defendant has the opportunity to "avoid prejudicial surprises at trial"; and (3) to preserve the defendant's plea against double jeopardy. State v. Sherman, 266 S.W.3d 395, 408-09 (Tenn. 2008). A bill of particulars is not a discovery device. Id. at 409. Instead, "the purpose of a bill of particulars is to alert criminal defendants as to the how the State will proceed with the litigation. The purpose is not to lock the State into a specific theory of prosecution." Id.

In this case, the post-conviction court found that trial counsel had provided discovery to the Petitioner and that there was "no additional discovery in the super[s]eding indictment." Further, the post-conviction court held that the Petitioner had failed to prove that "had trial counsel received a more particular description it would have changed trial strategy or affected the outcome of the trial." At the hearing, trial counsel explained that he did not request additional discovery after the superseding indictment was filed because "it was the same discovery." Further, the Petitioner has failed to identify what new information would have been revealed had trial counsel requested

additional discovery after issuance of the superseding indictment. Finally, the Petitioner has failed to show how requesting a bill of particulars would have provided information about the State's theory of premeditation. As noted above, a bill of particulars is not a discovery device, and the purpose of a bill of particulars is not to lock the State into a theory of prosecution. Id. Moreover, the Petitioner provided no evidence of what a bill of particulars would reveal, outside of his speculation that it would show there was no evidence of premeditation. Therefore, the Petitioner has failed to show that trial counsel was deficient in failing to request additional discovery or a bill of particulars, and he has failed to show that he was prejudiced by the alleged deficiency.

**Failure to Convey Plea Offers to the Petitioner:**

The Petitioner next argues that trial counsel was ineffective for failing to convey plea offers. The Strickland standard also applies during plea negotiations. Missouri v. Frye, — U.S. —, 132 S. Ct. 1399, 1407-09 (2012); Nesbit v. State, 452 S.W.3d 779, 787 (Tenn. 2014). Accordingly, during the plea bargain process, "counsel has the responsibility to render effective assistance as required by the Sixth Amendment." Nesbit, 452 S.W.3d at 787 (citing Frye, 132 S. Ct. 1407-08). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Frye, 132 S. Ct. at 1408. "A fair trial will not correct trial counsel's deficient performance in failing to convey a plea offer[.]" Nesbit, 452 S.W.3d at 787 (citing Lafler v. Cooper, — U.S. —, 132 S. Ct. 1376, 1381 (2012)).

In this case, trial counsel testified that there was never a formal plea offer to the Petitioner. Instead, any plea offer that would have been extended to the Petitioner was contingent upon Elvin's also pleading guilty. Because Elvin did not accept a plea, no separate offer was extended to the Petitioner. Further, trial counsel noted that he told the Petitioner about the package deal during one of the Petitioner's court appearances. The Petitioner claimed that trial counsel never conveyed a plea offer, but the post-conviction court specifically discredited the Petitioner's testimony. Therefore, the Petitioner has failed to show that trial counsel was deficient and is not entitled to relief on this issue.

**Failure to Object to Mr. Shute's Testimony:**

The Petitioner argues that trial counsel was ineffective for failing to object to the introduction of Mr. Shute's testimony. The Petitioner claims that Mr. Shute was not listed on the indictment and that his testimony was irrelevant to determining the Petitioner's guilt for felony murder and attempted murder. The State argues that Mr. Shute's testimony set a factual background for the offense. The post-conviction court found that the Petitioner had failed to prove that there would have been a different outcome had trial counsel objected to Mr. Shute's testimony.

In this case, Mr. Shute's testimony showed that the Petitioner had engaged in a drug transaction with Mr. Shute in which Mr. Shute stole the Petitioner's money. The Petitioner admitted in the post-conviction hearing that he confronted the victims in an attempt to find Mr. Shute. Therefore, the evidence was relevant to explain why the Petitioner confronted the victims at all. See Tenn. R. Evid. 402 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.")

The Petitioner claimed that trial counsel seemed surprised to learn that Mr. Shute would testify. However, trial counsel testified that he "did have some knowledge about [Mr. Shute]" prior to his testimony. Trial counsel also noted that he would have objected to Mr. Shute's testimony if he did not have prior knowledge about him because he was not listed on the indictment. Further, the Petitioner did not present any proof at the post-conviction hearing, aside from his opinion that Mr. Shute's testimony was presented in order to mislead the jury and present the offense as a "bad drug deal," and the post-conviction court specifically discredited the Petitioner's testimony. Moreover, Mr. Comer saw the Petitioner shoot Mr. Scott in the back and identified the Petitioner as one of the shooters in a photographic lineup. Elvin Hubie Pearson, 2009 WL 1616678, at *3-4. Mr. Newsome also identified the Petitioner in a photographic lineup. Id. at *5. We agree with the post-conviction court's finding that the Petitioner has failed to show that trial counsel was deficient or that the outcome of the trial would have been different had trial counsel objected to the introduction of Mr. Shute's testimony. The Petitioner is not entitled to relief on this issue.

**Challenge State's Theory of Premeditation:**

Finally, the Petitioner argues that trial counsel was deficient for failing to challenge the State's theory of premeditation as a defense. However, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Strickland, 466 U.S. at 691. Moreover, we will not second-guess a sound, yet ultimately unsuccessful strategic trial decision on appeal. Granderson, 197 S.W.3d at 790.

In this case, the Petitioner told trial counsel "from day one" that he was not involved with the crimes and that he had an alibi. Trial counsel confirmed the Petitioner's alibi with his mother and younger brother. Trial counsel also testified that, based on his experience, it would not have been feasible to pursue both an alibi defense and argue to the jury that the killing was not premeditated because the defenses were inconsistent. Therefore, trial counsel thought the Petitioner's alibi was his best available defense. Trial counsel was not aware that the alibi was fabricated until the morning of

trial.  Trial counsel made a sound strategic decision to pursue an alibi defense, which we will not second-guess on appeal.  See id.  The Petitioner has failed to show that trial counsel was deficient for failing to challenge premeditation as a defense.

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE